# In the United States Court of Federal Claims

No. 09-186L

(Filed: May 6, 2011)

```
*******************************  *
                                 *
CAPREAL, INC., et al.,           *   National Trails System Act, 16
                                 *   U.S.C. § 1241 et seq. (2006);
              Plaintiffs,        *   Fifth Amendment Takings Claim;
                                 *   Scope of Easement; Federal
                                 *   Board's Notice of Interim Trail
 v.                              *   Use Blocked Reversion to Fee
                                 *   Simple    Landowners    Under
THE UNITED STATES,               *   Massachusetts Law; Railbanking;
                                 *   Abandonment.
              Defendant.         *
                                 *
*******************************  *
```

*Steven M. Wald*, with whom were *Brent W. Baldwin, J. Robert Sears, Thomas S. Stewart*, and *Elizabeth G. McCulley*, Baker Sterchi Cowden & Rice, LLC, St. Louis and Kansas City, Missouri, for Plaintiffs.

*Kristine S. Tardiff*, with whom were *Ignacia S. Moreno*, Assistant Attorney General, and *Emily M. Meeker*, Environmental & Natural Resources Division, Natural Resources Section, United States Department of Justice, Washington, D.C., *Evelyn Kitay*, Surface Transportation Board, Of Counsel, for Defendant.

OPINION AND ORDER

WHEELER, Judge.

      Plaintiffs in this Fifth Amendment takings case are landowners who claim fee simple interests in real property formerly subject to railroad easements. The railroad right-of-way is located in southern Massachusetts, and is known locally as the Southbridge Secondary Track. The right-of-way has been acquired by the Commonwealth of Massachusetts for a recreational trail pursuant to a Notice of Interim Trail Use or Abandonment (NITU) issued by the federal Surface Transportation Board (STB). Plaintiffs claim that, if not for the issuance of the NITU, they would have held a fee simple interest free of any easement. They seek compensation from the United States for preventing the easement from extinguishing and thereby taking their property.

Three motions for summary judgment have been filed: (1) Defendant's motion for summary judgment based on title issues; (2) Plaintiffs' motion for partial summary judgment on liability; and (3) Defendant's cross-motion for summary judgment on liability. The Court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1) (2006).

For the reasons explained below, the Court concludes that the Government has taken Plaintiffs' property through issuance of the NITU and Plaintiffs are entitled to compensation. Initially, the predecessors to the Providence & Worcester Railroad Company (P&W) obtained easements to use the right-of-way for railroad purposes. Under Massachusetts law, if the railroad abandoned the right-of-way, Plaintiffs would have held a fee simple interest free of the easement. The U.S. Government, through the issuance of the NITU, blocked the extinguishment of the easement and imposed a use of the right-of-way that was not within the scope of the original easement. The issuance of the NITU is a taking under the Fifth Amendment for which Plaintiffs are entitled to recover.

Defendant makes two arguments to show why under Massachusetts law it should not be liable for the conversion of the right-of-way to trail use. First, it argues that Plaintiffs' property interest is subject to the reserved right of the Commonwealth to acquire the land for any public purpose. Second, it argues that a recreational trail use is within the scope of the original easement. The Court finds neither of these arguments to be persuasive. Accordingly, Defendant's motion for summary judgment on title and cross-motion for summary judgment on liability are DENIED. Plaintiffs' motion for partial summary judgment on liability is GRANTED.

## Background[1]

The Southbridge Secondary Track is a right-of-way located in Worcester County, Massachusetts and Windham County, Connecticut. At issue in this case is the section of the trail located in Massachusetts, from milepost 0.18 in Webster to milepost 1.4 in Dudley, and from milepost 4.8 in Dudley to milepost 10.98 in Southbridge, a distance of approximately 7.4 miles. Pursuant to an agreement between P&W and the Commonwealth of Massachusetts, the land currently is owned by the Commonwealth, subject to P&W's right to reactivate rail service over the right-of-way in the future.

---

[1] The facts contained in this opinion do not constitute findings of fact by the Court. The facts are taken from the parties' proposed findings of uncontroverted facts and supporting exhibits furnished with the respective motions. The Court is satisfied that the material facts necessary to decide the issues presented are not in dispute.

A. <u>Legal and Statutory Framework</u>

Although the predecessors in interest to P&W acquired the railroad right-of-way pursuant to Massachusetts law, beginning with the Transportation Act of 1920, ch. 91, § 402, 41 Stat. 456, 477-78, the U.S. Government assumed a central role in the governing of railroads. <u>Nat'l Ass'n of Reversionary Prop. Owners (NARPO) v. Surface Transp. Bd.</u>, 158 F.3d 135, 137 (D.C. Cir. 1998). The STB has authority over the construction, operation, and abandonment of most railroad lines in the United States. <u>Caldwell v. United States</u>, 391 F.3d 1226, 1228 (Fed. Cir. 2004). A railroad cannot abandon or discontinue use of its rail line without STB approval. <u>NARPO</u>, 158 F.3d at 137. A railroad seeking to abandon its right-of-way must file either a standard abandonment application pursuant to 49 U.S.C. § 10903, or seek an exemption under 49 U.S.C. § 10502. <u>Caldwell</u>, 391 F.3d at 1228. If the railroad requests abandonment under the standard abandonment procedure of § 10903, the STB will grant the abandonment if it finds that "the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. § 10903 (2006). Under the exemption procedure, the railroad must submit certain certifications and the STB will publish a notice of the exemption in the Federal Register. 49 C.F.R. § 1152.50(b), (d). Abandonment is authorized within thirty days after publication unless stayed. 49 C.F.R. § 1152.50(d). Rail carriers must file a notice with the STB that they have consummated abandonment. 49 C.F.R. § 1152.50(e). When a railroad abandons a line through one of these procedures, federal regulatory jurisdiction ends and state property law then controls the disposition of the right-of-way. <u>NARPO</u>, 158 F.3d at 137.

Through passage of the National Trails System Act Amendments of 1983 (the Trails Act), Congress authorized a process by which the railroad's right-of-way can be preserved for future railroad use, and during the interim period, used as a recreational trail. 16 U.S.C. § 1247(d) (2006). Under this process, after a railroad files an application to abandon the right-of-way, a state, political subdivision, or private organization may file a request to acquire the right-of-way for interim trail use. 49 C.F.R. § 1152.29(a). If the railroad voluntarily agrees to negotiate an interim trail use, the STB will issue a Certificate of Interim Trail Use or Abandonment (CITU) (for abandonment proceedings), or a NITU (for exemption proceedings). 49 C.F.R. § 1152.29(c)-(d). The STB's issuance of a CITU or NITU gives the railroad and the interim trail user 180 days to negotiate an agreement. If no agreement is reached within 180 days after the issuance of the CITU or NITU, the railroad can abandon the right-of-way. <u>Id.</u> The notice also allows the railroad to discontinue service, cancel any applicable tariffs, and salvage track and related materials. <u>Id.</u> If the railroad and trail operator reach an agreement, the trail operator assumes full managerial and financial responsibility for the right-of-way subject to future restoration of rail service. 49 C.F.R. § 1152.29(a), (c), (d). The Trails Act provides that interim trail use "shall not be treated, for purposes of any law or rule of law,

as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. 1247(d).

The Trails Act process may constitute a Fifth Amendment taking because in many cases the railroad acquired the right-of-way as an easement and there are landowners abutting the right-of-way who own the land in fee simple. In such cases, the landowners "have interests under state property law that have traditionally been recognized and protected from governmental expropriation, and if, over their objection, the Government chooses to occupy or otherwise acquire those interests, the Fifth Amendment compels compensation." Preseault v. United States, 100 F.3d 1525, 1550 (Fed. Cir. 1996). Whether or not plaintiffs may have a claim for compensation depends upon the landowners' interest in the land. If the railroad obtained a fee simple interest over the land, the plaintiffs have no takings claim. Id. at 1533. If the railroad acquired only an easement, "the Trails Act prevents the operation of state laws that would otherwise come into effect upon abandonment – property laws that would result in extinguishment of easements for railroad purposes and reversion of rights of way to abutting landowners." Caldwell, 391 F.3d at 1229 (internal quotation omitted). A Fifth Amendment taking occurs if the original railroad easement is not broad enough to encompass a recreational trail. Id. Alternatively, a taking occurs if the easements were extinguished as a matter of state law prior to their conversion to trails. Preseault, 100 F.3d at 1545-46.

If there is a taking, the U.S. Government is responsible even if another public entity actually establishes the recreational trail, because the entity acquiring the trail is acting pursuant to U.S. Government authority. Id. at 1551. "[W]hen the Federal Government puts into play a series of events which result in a taking of private property, the fact that the Government acts through a state agent does not absolve it from the responsibility, and the consequences, of its actions." Id.

B. The History of the Southbridge Secondary Track

1. Acquisition of the Track

Beginning in the 1850s, the predecessors to P&W began acquiring the Southbridge Secondary Track by deed and condemnation. The parcels at issue in this case are those acquired by the railroad as easements. The parties agree on the identity of these parcels, which they have determined by reviewing the "Schedule of Lands Owned or Used for Purposes of a Common Carrier" for the subject right-of-way dated January 23, 1919, prepared by the New York, New Haven & Hartford Railroad Company and filed with the Interstate Commerce Commission ("the ICC Schedule"). There are three categories of parcels acquired as easements. First, on February 6, 1855, Aaron White conveyed an easement to the Boston & New York Central Railroad Company. Second, on March 30, 1866, the Boston, Hartford & Erie Railroad filed a "location" with the County Commissioners. Third, the land of William Edwards was condemned on October 27,

1881 by the New York and New England Railroad Company, the property of the heirs of Ammidown was condemned on August 6, 1867 by the Boston, Hartford & Erie Railroad Company, and the land of John Cheney was also condemned by the Boston, Hartford & Erie Railroad Company.[2]

The right to acquire land as easements through locations and condemnations was granted in the 1800s to railroads through their corporate charters. See Agostini v. North Adams Gaslight Co., 163 N.E. 745, 746 (Mass. 1928) (explaining that a railroad in its charter was given the powers set forth in chapter 39 of the Commonwealth's Revised Statutes). The corporate charters of the Boston, Hartford & Erie Railroad Company and the New York and New England Railroad Company permitted the railroads to acquire land for a right-of-way pursuant to the Commonwealth's laws governing railroads.[3] These nineteenth century laws allowed railroads to file "location plans" with the county commissioners identifying the most convenient route for their tracks. See Rowley v. Mass. Elec. Co., 784 N.E.2d 1085, 1087 (Mass. 2003). By filing these plans, the railroads automatically acquired easements. Id.

Defendant provided the Court with relevant sections of two compilations of Massachusetts statutes from the nineteenth century, the Revised Statutes of 1836 and the General Statutes of 1860. These statutes are identical in all material respects regarding railroad easements.[4] Since the railroads acquired the "locations" in 1866, and the condemnations occurred in 1867 and 1881, the General Statutes of 1860 govern the takings. Sections 17, 18, and 19 of Chapter 63 (the "location statutes") stated:

> Section 17. A corporation may lay out its road not exceeding five rods wide [82.5 feet]; and for the purpose of cuttings, embankments, and procuring stone and gravel, may within the limits of its charter in the manner herein provided take as much more land as may be necessary for

---

[2] The date that John Cheney's land was condemned is unclear from the exhibits, however, it was settled at the same time as the property of the heirs of Ammidown.

[3] The Boston, Hartford & Erie Railroad Company was the successor to the Southbridge and Blackstone Corporation, Abbott v. New York & N.E.R. Co., 15 N.E. 91, 99 (Mass. 1888), whose corporate charter gave it all the "powers and privileges and subject to all the liabilities, restrictions and duties, set forth in the forty-fourth chapter of the Revised Statutes, and in that part of the thirty-ninth chapter of said statutes relating to railroad corporations, and in all statutes which have been, or may hereafter be passed, relating to railroad corporations." St. 1849, ch. 194. Similarly, the corporate charter of the New York and New England Railroad Company, the recipient of William Edwards' conveyance, stated that it should be vested with all the "franchises, powers, and privileges and subject to all the restrictions, duties and liabilities set forth in the general laws . . . relating to railroad corporations." St. 1873, ch. 289.

[4] Compare sections 54, 55, and 75 of Chapter 39 of the Revised Statutes of 1836 with sections 17, 18, and 19 of Chapter 63 of the General Statutes of 1860. Rev. St. ch. 39, §§ 54, 55, 75; Gen. St. ch. 63, §§ 17, 18, 19.

the proper construction and security of the road, or as may be at any time necessary for depot or station purposes.

<u>Section 18</u>.  The corporation shall file the location of its road within one year with the commissioners of each county through which the same passes, defining the courses, distances, and boundaries, of such portion thereof as lies within each county.

<u>Section 19</u>.  A corporation may purchase or otherwise take land or materials necessary for making or securing its road and for depot and station purposes.  If it is not able to obtain such land or materials by an agreement with the owner, it shall pay such damages therefor as the county commissioners estimate and determine.  Land and materials without the limits of the road shall not be so taken without the permission of the owner, unless the commissioners on the application of the corporation and after notice to the owner first prescribe the limits within which the same may be taken.

Gen. St. ch. 63, §§ 17, 18, 19.

 2. <u>History of the Track</u>

During the early 1900s, the Southbridge Secondary Track served industries located in Southbridge, Massachusetts.  The railroad use of the Southbridge Secondary Track began declining in the 1940s and 1950s with the development of the interstate highway system.  In 1976, P&W acquired the Southbridge Secondary Track.  P&W used the railroad line on an as needed basis until 1988.  In 1988, P&W stopped using the line entirely.  The Commonwealth of Massachusetts considered using the Southbridge Secondary Track as a multi-use trail beginning in 1993.  In 2000, the Massachusetts Legislature enacted Chapter 235 of the Acts of 2000, "An Act Providing for an Accelerated Transportation Development and Improvement Program for the Commonwealth" which provided "that $1,300,000 shall be expended for the acquisition of the inactive spur line of the Providence and Worcester Railroad Company known as the Southbridge Secondary Track that extends from the town of Southbridge through the town of Webster for an 11 mile recreational bike trail[.]"  St. 2000, ch. 235.  The 2003 Regional Transportation Plan included potential construction of a multi-use trail along the Southbridge Secondary Track.

On October 15, 2003, P&W filed a Notice of Exemption under 49 C.F.R. § 1152.50 seeking authority from the STB to abandon the Southbridge Secondary Track right-of-way.  The abandonment was scheduled to become effective on December 4, 2003. By letter dated November 13, 2003, the Commonwealth of Massachusetts, through its Executive Office of Transportation and Construction, filed a request with the STB

asking for the imposition of a public use condition and an interim trail use condition. By letter dated November 21, 2003, P&W agreed to negotiate interim trail use "with the understanding that the Commonwealth has agreed to purchase the [Southbridge Secondary Track] and the parties expect this to occur." On December 3, 2003, the STB issued the Decision and NITU. The NITU stated that if the parties reached an interim trail use/railbanking agreement by the 180th day after service (by June 1, 2004), interim trail use could be implemented without further action by the STB. If the parties could not reach an agreement, P&W could abandon the right-of-way. The parties were unable to reach an agreement within 180 days, but received several time extensions, extending the negotiation period until September 14, 2004.

On August 24, 2004, P&W signed an agreement for the Commonwealth of Massachusetts to acquire the Southbridge Secondary Track right-of-way. The Commonwealth paid P&W $1.3 million to acquire the right-of-way by eminent domain. P&W formally released the company's claim for any additional damages or compensation beyond $1.3 million dollars. In the release, P&W stated that the rail line located on the premises has not been abandoned as that term is defined by applicable federal and state regulations. P&W also stated in the release that the right-of-way is subject to the terms of the NITU served on December 3, 2003, and is subject to possible reinstatement of rail service. On August 27, 2004, the Commonwealth issued an Order of Taking stating that it took the land pursuant to Chapter 79 of the General Laws of Massachusetts, its state condemnation statute.

### C. Court Proceedings

On March 26, 2009, Capreal, Inc. filed a complaint for itself and as a representative of a class of similarly situated persons and entities. On July 30, 2009, the parties filed a joint proposal concerning class certification. The Court granted class certification on August 18, 2009. The Court stated that as agreed by the parties, the class shall consist of the following individuals:

> (1) who own an interest in lands constituting part of the railroad corridor or right-of-way that is locally known as the Southbridge [Secondary] Track and on which a rail line was formerly operated by the Providence and Worcester Railroad Company in Worcester County, Massachusetts, between milepost 0.18± in Webster, Massachusetts, and milepost 1.4± in Dudley, Massachusetts, and between milepost 4.8± in Dudley, Massachusetts, and milepost 10.98± in Southbridge, Massachusetts;
>
> (2) whose property was the subject of a Notice of Interim Trail Use issued on December 3, 2003, by the Surface Transportation Board pursuant to the [Trails Act] and its implementing regulations;

> (3) who claim a taking of their rights to possession, control, and enjoyment of such lands due to the operation of the railbanking provisions of the [Trails Act], 16 U.S.C. § 1247(d); and
>
> (4) who affirmatively opt into this lawsuit in accordance with the procedures outlined in the Court's Scheduling Order, issued this date; but
>
> (5) excluding owners of land that abut segments of the subject right-of-way that the railroad acquired fee simple title to; railroad companies and their successors in interest; persons who have filed, intervened or choose to intervene or opt in to separate lawsuits against the United States for compensation for the same interests in land; persons with an ownership interest in the segment of the right-of-way that is located in the State of Connecticut; and persons who are judges and justices of any court in which this action may be adjudicated or to which it may be appealed.

(Order on Plaintiffs' Motion to Certify Class Action 5-6 (Aug. 18, 2009)).

The Court found that the common question of law applicable to all Plaintiffs was whether a Fifth Amendment taking occurred when the STB issued the NITU. Id. at 4. The Court set December 3, 2009 as the date by which putative class members had to opt-in to the class. Id. at 8. Ninety-nine persons or entities opted into the class. See Fourth Amended Compl. ¶ 26. The parties have stipulated that Plaintiffs Krishnakant K. Swadia and Jean M. Murphy meet class eligibility. (Joint Stipulation in Compliance with Court's April 1, 2011 Order (Apr. 8, 2011)). For the remaining people or entities who have opted into the class, it will be necessary to correlate the locations of the property owned by Plaintiffs with the fee simple segments and easement segments of the right-of-way for the purposes of determining which claims should be dismissed and which claims should proceed. (Joint Status Report Regarding Class Member Eligibility and Further Proceedings 2 (Apr. 16, 2010)). The parties have stated that they were unable to make the correlation based on the maps and title documentation produced to date and have agreed that further mapping should be deferred pending the resolution of the other title and liability issues. Id. The parties also agreed that the case should be resolved through motions for summary judgment.[5] Id. at 3-4.

---

[5] When the Court refers to "Plaintiffs" in this opinion, it is only referring to those Plaintiffs listed in the fourth amended complaint who are members of the class. Any Plaintiff listed on the fourth amended complaint who did not own land on December 3, 2003 abutting a segment of the right-of-way taken as an easement is not a member of the class. Defendant asks the Court in its opening brief to enter summary judgment in its favor as to those Plaintiffs whose property abuts segments of the right-of-way taken as fee segments. Entering summary judgment against such Plaintiffs is unnecessary. They are not members of

Defendant filed a motion for summary judgment based on title issues on July 21, 2010. Defendant argued that its motion is dispositive because Plaintiffs' title is a threshold issue. On September 7, 2010, Plaintiffs responded to this motion, and also filed a motion for partial summary judgment on liability. On November 19, 2010, Defendant filed its cross-motion for summary judgment on liability and reply in support of its motion for summary judgment on title. On January 7, 2011, Plaintiffs filed their reply in support of their motion for partial summary judgment on liability and with leave of the Court, filed a sur-reply in opposition to Defendant's motion for summary judgment on title. On January 24, 2011, Defendant filed its reply in support of its cross-motion for summary judgment on liability.

The Court heard oral argument on February 25, 2011. At the Court's request, the parties filed a joint stipulation on April 8, 2011 identifying at least one plaintiff who held a fee simple interest on the date of the issuance of the NITU, and who had granted the railroad an easement. The stipulation addressed the Court's concern that a justiciable controversy existed that could be resolved through the pending motions.

## Standard of Review

"A motion for summary judgment should be granted if the pleadings, the discovery, and the disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." RCFC 56(c)(1). A fact is material if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Fact disputes that are irrelevant to the outcome of the case will not preclude summary judgment. Id. A genuine issue is one that "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of establishing the absence of any genuine issue of material fact, and any doubt over factual issues will be resolved in favor of the non-moving party. Mingus Contractors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). Once the burden is met, a party opposing a motion for summary judgment must point to evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. Rogers v. United States, 90 Fed. Cl. 418, 427 (2009) (citing Liberty Lobby, 477 U.S. at 256.) "Where the moving party has not disputed any facts contained in the non-movant's pleadings, the court assumes all well-pleaded facts to be true and draws all applicable presumptions and inferences therefrom in favor of the non-moving party." Whispell Foreign Cars, Inc. v. United States, No. 09-315L, 2011 WL 380457, at *4 (Fed. Cl. Feb. 7, 2011).

---

the class and their claims will not proceed once the parties complete the correlation of the segments of the right-of-way to the parcels owned by the Plaintiffs listed in the complaint.

"The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law to one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts." Mingus Contractors, Inc., 812 F.2d at 1391. "[T]he Court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Id.

### Discussion

The Court finds that the federal entity's issuance of the NITU blocked the extinguishment of Plaintiffs' easements pursuant to state law and imposed a new use on the easements that was broader in scope than the original easements. To reach this conclusion, the Court addresses three distinct issues. First, the Court must examine what property interest Plaintiffs hold under state law. For this question, although the parties agree that Plaintiffs' land was taken by the railroad as an easement, Defendant argues that under Massachusetts law, the land would not revert to Plaintiffs upon abandonment. The Court addresses this issue first and finds that Defendant is wrong as a matter of Massachusetts law. The easement would have been extinguished under the operation of state law if P&W had abandoned the right-of-way. Second, the Court addresses the question of whether recreational trails are within the scope of the original easement. If the original easements encompassed recreational trails, no taking would exist. However, the Court finds that the easements did not encompass recreational trails. Third, the Court addresses the issue of abandonment. The Court finds that by filing the notice of exemption, the railroad expressed an intent to abandon the right-of-way.

A. Plaintiffs' Property Interest

The Court must first determine the nature of the property interest Plaintiffs would have had under Massachusetts law absent federal action. See Preseault v. I.C.C., 494 U.S. 1, 21 (1990) (O'Connor J., concurring) ("Determining what interest petitioners would have enjoyed under Vermont law, in the absence of the ICC's recent actions, will establish whether petitioners possess the predicate property interest that must underlie any takings claim.") The Federal Circuit has ruled that if a railroad obtained a fee simple interest, then Plaintiffs have no claim, but if the railroad acquired an easement, Plaintiffs possess the predicate property interests and the analysis then turns to the scope of the easement and abandonment. Preseault, 100 F.3d at 1533. The parties in this case agree that certain segments of the right-of-way were taken as easements. Nevertheless, Defendant asserts that the Court must first examine Plaintiffs' title, because under Massachusetts law, there are limitations and restrictions that inhere in Plaintiffs' title. (Def.'s Mot. Summ. J. Title 15, 19.) Specifically, Defendant argues that Plaintiffs' ownership of the reversionary interest is subject to the Commonwealth's reserved right to acquire the subject right-of-way for public purposes. Id. at 3. According to Defendant,

the Commonwealth's acquisition on August 24, 2004 of the Southbridge Secondary Track for trail use was within its reserved right, and thus, the NITU had no effect on Plaintiffs' property interest under state law. Id. at 20. Defendant further explains that even if P&W had consummated abandonment, the land would not have reverted to Plaintiffs under the operation of state law until the Commonwealth decided whether to exercise its reserved rights. (Def.'s Mot. Summ. J. Liability 14-15.) The Court has reviewed Massachusetts law from the nineteenth century when the railroad took the easements and has determined that there was no reserved right under Massachusetts law to acquire the land for any public purpose.

The property rights of landowners are governed by the law in effect at the time they acquired the land. Hash v. United States, 403 F.3d 1308, 1315 (Fed. Cir. 2005). As noted earlier, the railroads acquired their easements pursuant to statutes that allowed a railroad corporation to "lay out its road not exceeding five rods wide" and "file the location of its road" with the county commissioners in order to obtain an easement (the "location statutes"). Gen. St. ch. 63, §§ 17, 18. Defendant bases its argument regarding the Commonwealth's reserved rights on two statutes ("the "acquisition statutes") that existed when P&W's predecessors acquired their easements. (Def.'s Mot. Summ. J. Title 18.) The first statute, Section 138 of Chapter 63 of the General Statutes of 1860, stated:[6]

> The commonwealth may at any time during the continuance of the charter of any corporation, after the expiration of twenty years from the opening of its road for use, purchase of the corporation its road, and all its franchise, property, rights and privileges, by paying therefor such sum as will reimburse it the amount of capital paid in, with a net profit thereon of ten per cent a year from the time of the payment thereof by the stockholders to the time of the purchase.

Gen. St. ch. 63, § 138.

The second statute, which was enacted in 1870 and therefore was not part of Massachusetts law when Boston, Hartford & Erie Railroad Company acquired its land through location filings and condemnation, but was passed before the condemnation of the land of William Edwards by the New York and New England Railroad Company, stated: "The Commonwealth may, at any time take and possess the road, franchise and other property of any railroad corporation after giving one year's notice in writing to such

---

[6] This 1860 version of the statute was not provided by either party but is available on page 370 at http://www.archive.org/details/generalstatuteso1860mass, visited by the Court on May 4, 2011. Defendant did provide the Court with an earlier version of the statute from 1836. Rev. St. ch. 39. § 84. The 1836 version is the same in all respects material to this opinion.

railroad corporation, and paying therefor such compensation as may be awarded by three commissioners." St. 1870 ch. 325, § 2.[7]

To reach its conclusion on Massachusetts law, Defendant reads the acquisition and location statutes together. In Defendant's view, for every easement taken through the location statutes, the acquisition statutes allow Massachusetts to then acquire the easement for any public purpose without further compensation to the owners with the reversionary interest. Furthermore, Defendant argues that the acquisition statutes act as a right of first refusal, allowing Massachusetts to make a determination on whether to acquire easements before the land reverts to the fee simple owners.

The Court disagrees with Defendant's reading of the statutes. "A statute must be interpreted according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished." Rowley, 784 N.E.2d at 1088 (internal quotation omitted). In interpreting statutes, the Massachusetts Supreme Judicial Court has held that "[w]e cannot read into a statute words that the Legislature did not see fit to embody in the enactment. We are bound to interpret a statute as it is written." West's Case, 46 N.E.2d 760, 763 (Mass. 1943). See also Boulter-Hedley v. Boulter, 711 N.E.2d 596, 598 (Mass. 1999) (citations omitted) ("While we should interpret statutes to give effect to the Legislature's intent and should construe related statutes to constitute [a] harmonious whole consistent with legislative purpose, we cannot read into a statute a provision which simply is not there.")

Defendant's interpretation of the statutes would require this Court to read into the acquisition statutes provisions that are not in the text of the statutes. The acquisition statutes clearly allow the Commonwealth to acquire the railroad's right-of-way. The language is broad in its description of what the Commonwealth can acquire from the railroad, and it is clear that the Commonwealth can purchase or take the right-of-way regardless of whether it was acquired as a fee simple interest or as an easement. However, the statutes only dictate the responsibilities of the Commonwealth toward the railroad. The statutes are silent on the possible responsibilities of the Commonwealth toward the landowners with reversionary interests if, after acquiring the land, the Commonwealth uses the land for a purpose outside the purpose of the original easement. The Court will not read into this silence a right to take the reversionary owners' land without any compensation. If the Massachusetts legislature believed that the acquisition statutes included this broader right, it would have said so explicitly.

---

[7] Defendant provided a 1903 compilation version of this statute. The statute quoted appears in the 1870 version available online at page 238 of http://www.archive.org/stream/actsresolvespass1870mass #page/n5/mode/2up, last visited by the Court on May 5, 2011.

-12-

Further, statements in case law from the second half of the nineteenth century indicate that Massachusetts courts understood these easements to be extinguished upon abandonment. In Nye v. Taunton Branch R.R. Co., 113 Mass. 277 (1873), the Supreme Judicial Court of Massachusetts explained the manner in which a railroad can acquire a right-of-way.

> Two methods are pointed in the Gen. Sts. c. 63, § 19, for the taking of land by a railroad corporation, for making and securing its road, and for depot and station purposes without the limits of the road: First, by purchase and conveyance from the owner[;] [s]econd, if the owner refuses to sell, by application to the county commissioners and the assessment of damages. By the first method the corporation obtains a fee in the soil; by the second the land is condemned to a servitude, and an easement is created in the corporation, which may be permanent in nature and practically exclusive. When it holds by the first, it derives its title solely from the deed; if the deed is without restriction, reservation or condition, the corporation may convey the land, if no longer necessary for its purposes; *when it takes by the second, if the use is abandoned, the easement is extinguished, and the land reverts to the owner of the soil.*

Id. at 278-79 (emphasis added) (citation omitted); see also Proprietors of Locks & Canals on Merrimack River v. Nashua & Lowell R.R. Co., 104 Mass. 1, 7 (1870) ("That property, once taken and held by right of eminent domain, may be abandoned, so as to restore the original owner to his former rights, we are not disposed to question."). Neither of these cases gives any indication that the Massachusetts Supreme Judicial Court understood the statutes then governing railroads to provide Massachusetts with a right of first refusal upon a railroad's abandonment of its right-of-way. Thus, reviewing the law in effect when the easements were acquired, the Court does not find that Massachusetts had the right to take land of the reversionary landowners without compensating them.

Massachusetts currently does have a statute that gives it a right of first refusal. Enacted in 1975, the statute states that railroads cannot "sell, transfer, or otherwise dispose of" a railroad right-of-way without first offering to sell the right-of-way to the Commonwealth. MASS. GEN. LAWS ch. 161C, § 7 (1975). However, this law was not in effect at the time the railroad acquired its easements and therefore does not affect the ownership interests of the reversionary property owners.

Furthermore, even recent Massachusetts cases have found that abandonment of the easement by the railroad extinguishes the easement. In 2009, the Massachusetts Land Court noted that when a railroad corporation owned an 1846 easement created pursuant to the location statutes and filed a Notice of Abandonment with the STB, the easement extinguished and the abutting owners held fee simple interests free of the prior railroad easements. Swan v. Mass. Bay Transp. Auth., No. 313413(GHP), 2009 WL 1914779, at

*9 (Mass. Land Court 2009).  The <u>Swan</u>, <u>Nye</u>, and <u>Merrimack River</u> decisions have observed that upon extinguishment of the easement for railroad purposes in Massachusetts, the land is again owned by the holders of the reversionary interest.

The Court does not question the Commonwealth's right to acquire railroad rights-of-way for use for any public purpose, while also compensating any abutting landowners for the taking.  The power to take land through eminent domain is an inherent power of the state and all private property is subject to the power of the state to take it by eminent domain.  <u>Adirondack Ry. Co. v. New York</u>, 176 U.S. 335, 346-47 (1900).  Defendant, however, argues that on August 24, 2004, the Commonwealth acquired the Southbridge Secondary Track right-of-way pursuant to some reserved right to acquire the land for any public purpose without compensation.  The Court categorically rejects the proposition that the Commonwealth could take the reversionary property interest under state law with no compensation to abutting landowners.  Thus, absent the federal involvement, the Commonwealth could have purchased the right-of-way much like it did, but it must have compensated Plaintiffs for the taking.

Plaintiffs' fee simple title does not have the inherent restrictions described by Defendant.  The railroad had easements that would have been extinguished under state law upon abandonment.  The NITU prevented this extinguishment.  Unless trail use is within the scope of the easements, the U.S. Government took the land and must compensate Plaintiffs under the Fifth Amendment.

B.  <u>Scope of Easement</u>

Although the easements in this case would be extinguished upon abandonment pursuant to Massachusetts law, as the Federal Circuit explained in <u>Preseault</u>, if the original easements are sufficiently broad so that the purpose of the easement could encompass a recreational trail, then use of the right-of-way as a trail is not a violation of Plaintiffs' underlying fee simple estate.  <u>Preseault</u>, 100 F.3d at 1541.  On the question of whether the easements conveyed to the predecessors of P&W were broad enough to encompass recreational trails, the Court finds that they were not.  Because the NITU imposes both interim trail use and railbanking, the imposition of a recreational trail on the easement is sufficient to constitute a taking.  However, Defendant requests the Court to find that even if interim trail use is beyond the scope of the easement, railbanking is a permissible use under the original easements.  The Court finds that railbanking is not a permissible use.

The scope of an easement is a matter of state law.  <u>See</u> <u>Toews v. United States</u>, 376 F.3d 1371, 1377-79 (Fed. Cir. 2004) (analyzing the scope of an easement under California law); <u>Chevy Chase Land Co. v. United States</u>, 230 F.3d 1375 (Table), 1999 WL 1289099, at *3 (Fed. Cir. 2000) (holding that original easement encompassed recreational trails after certifying the case to the Court of Appeals of Maryland);

Preseault, 100 F.3d at 1541-44 (analyzing the scope of the easement under Vermont law). In this case, the railroad acquired easements through two different methods, under the location and condemnation procedure and under the Aaron White Deed. Utilizing Massachusetts law, the Court will address whether the easements acquired through each method are broad enough to encompass recreational trails.

### 1. The Location and Condemnation Procedure

The parties agree that easements listed on the ICC Schedule as taken by location and condemnation have the scope of easements acquired through the Massachusetts location statutes. (Pls.' Mot. Summ. J. Liability 14-18; Def.'s Mot. Summ. J. Liability 31.) The location statutes permitted a railroad corporation to "lay out its road not exceeding five rods wide" and to "take as much more land as may be necessary for the proper construction and security of the road." Gen. St. ch. 63, § 17.

Although no Massachusetts court has decided the precise question of whether the easements taken by the location statutes are broad enough to encompass a recreational trail, those courts have analyzed the scope of these easements. The early cases held that the easements were broad but not limitless. "The right acquired by the corporation, though technically an easement, yet requires for its enjoyment a use of the land, permanent in its nature, and practically exclusive." Hazen v. Boston and Maine R.R., 68 Mass. 574, 580 (1854). A railroad was permitted to use land taken for the purposes of a station house to provide lodging and food for the public in addition to lodging and food for its passengers because "any occupation of [the land] which is concurrent and consistent with, and does not exclude, its occupation for station purposes, must be presumed to be under that right." Peirce v. Boston & L.R. Corp., 6 N.E. 96, 101 (Mass. 1886). However, a railroad could not abandon railroad uses and convert buildings on the land for use as private, non-railroad freight houses. Merrimack River, 104 Mass. at 11-12.

Later cases similarly have held that easements could be used broadly for purposes like in kind to the original easement, but that the uses of railroad easements were not limitless. In Agostini v. North Adams Gaslight Co., the Supreme Judicial Court of Massachusetts, analyzing the 1836 Revised Statutes version of the location statutes,[8] stated that "in a taking by eminent domain only such rights are acquired as are reasonably necessary to accomplish the purpose for which the taking is made, unless the Legislature authorizes the acquiring of greater rights." 163 N.E. at 746. The Court then explained the purpose of these early easements. "The early acts of incorporation of railroads indicate a precise perception of the railroad as a highway of travel, which might be open to the general public in something the same way as turnpikes had been used." Id.

---

[8]  As noted in the Background section, the Revised Statutes version of the location statutes and the General Statutes version of the location statutes, under which P&W's predecessors took the easements, are the same in all material respects.

(citation omitted). The court also explained that for easements acquired by railroads "[t]he easement taken is co-extensive with, but limited to, such rights as are reasonably necessary to accomplish the purposes for which the corporate franchise was granted." Id. at 747. Having observed that these easements were limited for the purposes of a highway for travel, the court found that an electric company had no right to place electric wires over land acquired by a railroad as an easement. Id. at 746. In Leroy v. Worcester St. Ry. Co., the court, analyzing an easement taken pursuant to sections 17 and 18 of Chapter 63 of the General Statutes of 1860, found that the scope of the original easements included the operation of motorbuses over the right-of-way. 191 N.E. 39, 43 (Mass. 1934). The Court ruled that the easement to the railroad was for transportation of the public "whether by steam, electricity, or vehicles propelled by other power." Id. at 45. The Court held that unlike in Agostini, Defendant was not using the right-of-way for a purpose inconsistent with its corporate franchise. Id. at 44. "The exercise of a right additional to, but not differing in kind from, the rights originally granted does not invade unlawfully the plaintiff's property rights." Id.

Thus, the Massachusetts case law on the railroad easements acquired under the location statutes treats the railroad rights-of-way as easements for public transportation. The Massachusetts courts have held that a use similar in kind could be imposed on these original easements. However, this Court finds that a recreational trail use is outside the scope of easements for public travel. A railroad, or a highway for public travel, has the primary purpose of transporting goods and people. The purpose of a recreational trail is fundamentally different. A bicycle trail does not exist to transport people but rather to allow the public to engage in recreation and enjoy the outdoors. The two uses are distinct and an easement for a recreational trail is not like in kind to an easement for railroads. This Court and the Federal Circuit have adopted similar positions. See Toews v. United States, 53 Fed. Cl. 58, 62 (2002) (explaining that a recreational trail was not within the scope of a railroad easement because "the use is different in kind. The purpose is fundamentally recreational, not the movement of goods or people in commerce."), aff'd, Toews v. United States, 376 F.3d 1371 (Fed. Cir. 2004). See also Preseault, 100 F.3d at 1542 ("Although a public recreational trail could be described as a roadway for the transportation of persons, the nature of the usage is clearly different."). Thus, while the scope of the easement was broad enough to include different modes of public transportation, it is not broad enough to include a recreational trail. The recreational trail imposed a new use on Plaintiffs' property and therefore constituted a taking.

### 2. The Aaron White Deed

The scope of the Aaron White Deed also was not broad enough to convey an easement that could be used for a recreational trail. The relevant section of the Aaron White Deed conveyed the following rights to the railroad:

> [A] right of location, construction way and continued passage and use of a Rail way by steam or other power with one or more tracks upon over and through the following described lot of land situated in Dudley in the County of Worcester and Commonwealth of Massachusetts which Rail way is to be built and maintained in manner as is hereinafter mentioned with the reservations hereinafter mentioned.

Aaron White Deed (Feb. 6, 1855).

The deed conveyance also discusses the building of walls alongside the railroad, a way to pass under the railroad in one location, and a railroad crossing at another location. Id. The conveyance also stated that the right to transport freight passengers would "not commence until the walls, ways [and] passes across said lot herein agreed to be made by said company shall be completed [and] shall cease whenever and so long as they shall neglect to maintain the same." Id.

For easements created through conveyance, the easement "must be construed with reference to all its terms and the then existing conditions so far as they are illuminating." Cannata v. Berkshire Natural Res. Council, Inc., 901 N.E.2d 1250, 1256 (Mass. App. Ct. 2009) (quoting Lowell v. Piper, 575 N.E.2d 1159, 1162 (Mass. App. Ct. 1991)). "A reviewing court must construe the scope of an easement from the parties' intent ascertained from the relevant instruments and the objective circumstances to which they refer." Id. (internal quotation omitted).

The terms of the deed indicate that the easement was limited to the purposes of a railroad. Defendant argues that the easement should be read as broadly as the easements taken by location. (Def.'s Mot. Summ. J. Liability 38.) Whether the Court reads the grant narrowly or more broadly as Defendant desires, the Court still does not find that a recreational trail fits within the scope of the original easement. The Court already has determined that easements taken through the location statutes are not broad enough to include recreational trails.

### 3. Railbanking

Defendant suggests that, even if the Court finds recreational trail use to exceed the scope of the easement, the Court still should find that railbanking is a permissible use under the easement. If true, the extent of Defendant's liability would be limited to the incremental burden imposed by the trail use on the existing easement. (Def.'s Reply Mot. Summ. J. Liability 10.) The Court finds, however, that railbanking is too hypothetical and unlikely to serve as a railroad purpose. Under the release signed by P&W, the Commonwealth acquired the right-of-way. P&W or a successor has the right, but not the obligation, to reactivate rail service on the property. In order to reactivate service, P&W or a successor, would have to reconstruct the property at no cost to the

Commonwealth so it could accommodate both rail service and trail use. Alternatively, P&W would have to compensate the Commonwealth for an amount agreed to or the fair market value of the property, taking into account any improvements made by the Commonwealth.  In the event that the railroad chooses the first option, title in the property would remain with the Commonwealth.  The burden imposed on the railroad to reactivate service is high and the Court does not find that by agreeing to these requirements for reactivation, the railroad in fact planned on reactivating service.  The reactivation simply is too remote for railbanking to be considered a permissible railroad use.

Other courts reviewing railbanking have similarly concluded that the remote possibility of rail service being restored in the future is insufficient to constitute a railroad purpose. E.g. Toews, 376 F.3d at 1381 (holding that railbanking and the possibility that the easement might be one day turned into a light rail system was too speculative to serve as a basis to deny the plaintiffs compensation under the Fifth Amendment); Nordhus Family Trust v. United States, No 09-042L, 2011 WL 1467940, at *9 (Fed. Cl. Apr. 12, 2011) (refusing to find railbanking a railroad purpose because "there is no evidence of any plan to reactivate the rail service-simply a speculative assertion by Defendant that some resumed rail service could occur in the future."); Glosemeyer v. United States, 45 Fed. Cl. 771, 780 (2000) (refusing to hold potential future rail service a railroad purpose under Missouri law when the potentiality "exists purely in the realm of the hypothetical.").

### C. Abandonment

Defendant also argues that P&W did not abandon the railroad on the date of the issuance of the NITU, and the Court therefore should limit liability to the incremental burden imposed by railbanking and trail use on the existing easements. (Def.'s Reply Summ. J. Liability 6.)  The Court refuses to limit liability in this manner because there was an intention by the railroad to abandon the right-of-way.  Abandonment is a question of intent.  Sindler v. William M. Bailey Co., 204 N.E.2d 717, 719 (Mass. 1965). Abandonment can be established by an intention never again to make use of the easement in question.  Id.  The Court finds that in filing the Notice of Exemption, P&W demonstrated an intent to abandon the right-of-way for railroad purposes.  Defendant argues that P&W's filing of the Notice of Exemption also included an intention to participate in railbanking.  As discussed above, railbanking is too remote and hypothetical to constitute a railroad purpose.  Thus, the railroad demonstrated an intent to abandon the right-of-way for railroad purposes, the NITU prevented the railroad from carrying out its intention and blocked the reversion to the fee simple landowners.

## Conclusion

For the foregoing reasons, the Court finds that the U.S. Government is liable for taking Plaintiffs' property. Defendant's motion for summary judgment on title is DENIED, Defendant's cross-motion for summary judgment on liability is DENIED, and Plaintiffs' motion for partial summary judgment on liability is GRANTED. The parties are requested to file a joint status report on or before May 27, 2011 containing a proposed schedule for further proceedings in this matter.

IT IS SO ORDERED.

                                              s/ Thomas C. Wheeler
                                              THOMAS C. WHEELER
                                              Judge